IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BELINDA GAIL BROWN,  *
         *
   Plaintiff,  *
         *
v.        *  Case No. 3:06cv00710-MHT
         *
LIBERTY MUTUAL INSURANCE *
COMPANY, et al,   *
         *
   Defendants.  *

## MOTION FOR SUMMARY JUDGMENT

Comes now Defendant Liberty Mutual Insurance Company pursuant to Rule 56 of the Federal Rules of Civil Procedure and files this Motion for Summary Judgment, moving the Court to grant summary judgment to it and dismiss this case against it.  In support of this Motion for Summary Judgment, Defendant submits the following:

(1) Affidavit of Vacova Berryhill;

(2) Excerpts from the deposition of Plaintiff Belinda Brown;

(3) Memorandum brief in support of motion;

(4) All pleadings and discovery of record to date.

In further support of this motion, Defendant would show unto the Court that there is no genuine issue of material fact and it is entitled to summary judgment as a matter of law.

Respectfully submitted,

s/Richard B. Garrett
Richard B. Garrett (ASB-0782-A29R)

RUSHTON, STAKELY, JOHNSTON
& GARRETT, P.A.
Post Office box 270
Montgomery, Alabama 36101-0270
Telephone:  334/206-3100
Fax:  334/263-4157
E-mail:  rbg@rsjg.com

**Attorney for Defendant**

I hereby certify that on May 4, 2007, I electronically filed the foregoing with the Clerk of the court using CM/ECF system which will send notification of such filing to the following:  **STEPHEN D. HENINGER.**

**s/Richard B. Garrett**
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BELINDA GAIL BROWN,            \*
                                       \*

          Plaintiff,               \*
                                       \*

v.                              \*     Case No. 3:06cv00710-MHT
                                       \*

LIBERTY MUTUAL INSURANCE   \*
COMPANY, et al,                 \*
                                       \*

          Defendants.            \*

## AFFIDAVIT:

STATE OF TENNESSEE    )

COUNTY OF Williamson )

    Before me, the undersigned authority, personally appeared Vacova Berryhill, who, being by me duly sworn, doth depose and say on oath as follows:

    (1)    My name is Vacova Berryhill and I am a technical claims specialist with Liberty Mutual Insurance Company in Brentwood, Tennessee. I am submitting this affidavit in support of Liberty Mutual's Motion for Summary Judgment in this case. I have personal knowledge of the following facts from my personal involvement in handling this claim and from a review of claims notes, correspondence and other documents in the file.

    (2)    Plaintiff reported that she injured her back on February 2, 1993, while working for Hurley Manufacturing Company, Inc. Ms. Brown was initially afforded treatment through Dr. Michael Gaines and orthopaedic surgeon Dr. Daniel Michaels. Dr. Michaels referred her to orthopaedic surgeon Dr. Gaylon Rogers of Birmingham,

Alabama.  Dr. Rogers did fusion surgery on Ms. Brown's back and eventually went back in and removed the plates and screws which he had placed in Ms. Brown's back.

(3)    Dr. Rogers referred Ms. Brown to Dr. Watts to manage Ms. Brown's pain medication.  Dr. Watts tried some epidurals and also gave Ms. Brown steroid shots.  Dr. Watts eventually referred Ms. Brown back to her general physician, Dr. Stewart, for the steroid shots and to manage her medication.  Dr. Stewart eventually referred Ms. Brown to a pain management physician, Dr. Efrim Moore in LaGrange, Georgia, who is her current treating physician.

(4)    Plaintiff's claim for permanent partial disability was settled in May, 1995, except for ". . . reasonable, necessary, and authorized medical expenses incurred by her which are covered by the Worker's Compensation Act of Alabama . . .".

(5)    In addition to Dr. Rogers' surgery, over the years, Liberty Mutual has paid for spinal blocks, epidurals, physical therapy, one half of the cost of a mattress and box springs, two treadmills, a swim suit, a special cushion and back pillow, numerous medications, and other treatment for Ms. Brown.  Despite all of this treatment, Ms. Brown has continued to complain of severe back pain and over the years, various modalities of treatment have been attempted by numerous healthcare providers.

(6)    At one point in 2002, Dr. Moore did recommend a morphine pump for Ms. Brown.  Pursuant to recommended medical protocol and internal guidelines, Liberty Mutual had a psychological evaluation done to see whether Ms. Brown was an appropriate candidate for an implantable device.  The psychological evaluation advised that Ms. Brown was not an appropriate candidate.  Dr. Moore withdrew the request for a morphine pump saying that it would not help with the numbness in Ms. Brown's legs.

(7)    Dr. Moore next recommended a spinal cord stimulator (SCS) for Ms. Brown.    Pursuant to the Alabama Worker's Compensation Act utilization review procedures, Liberty Mutual initiated a utilization review of Ms. Brown's treatment and the request for SCS.  A first level review was obtained from a nurse case manager and a second level review from a regional medical director, both of whom recommended against the SCS.  Dr. Moore was advised of these recommendations and he disagreed with them.  Rather than follow the appeal procedures set out in the statute for utilization review, Dr. Moore went outside of the utilization review procedures and obtained a second opinion from a Dr. Serrato in Columbus, Georgia, who said that he felt that Ms. Brown was an appropriate candidate for an SCS.  After considering this matter and seeking the advice of counsel, Liberty Mutual agreed to a test of an SCS on Ms. Brown. The test was done in the Spring of 2006 and Ms. Brown reported that she got 50 percent relief from her pain.  Approval was given for the implantation of a permanent SCS and this was accomplished in June, 2006.

(8)    This lawsuit was filed on July 11, 2006, shortly after the implantation of the permanent SCS.

(9)    Since I took over handling this file in October, 2003, there have been no offers of settlement made to Plaintiff or her attorney to close out her future medicals.  I attempted to contact Plaintiff's attorney several times to see if they were interested in discussing settlement of future medicals, but never heard back from the attorney that they were interested.  Since I made no offer of settlement, I certainly did not try to coerce the Plaintiff into any settlement, much less a low settlement.

(10)    In all of its handling of Ms. Brown's claims, Liberty Mutual has attempted to act professionally and properly.    It has paid for numerous modes of treatment, devices, therapy, and other modalities of treatment prescribed and recommended by numerous healthcare providers, in order to try to provide relief for Ms. Brown's back and leg pain.    When the request for an SCS was made, Liberty Mutual attempted to utilize the statutorily mandated utilization review process to determine whether the SCS was appropriate and whether Ms. Brown was an appropriate candidate for it.    Liberty Mutual has certainly not acted in bad faith or outrageously in its handling of Ms. Brown's claims.

Vacova Berryhill, For Liberty Mutual
Insurance Company

        SWORN TO and subscribed before me this the ___3rd___ day of May, 2007.



Notary Public

My Commission Expires:

___3-31-08___

# FREEDOM COURT REPORTING

1      IN THE UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF ALABAMA

3           EASTERN DIVISION

4

5  BELINDA GAIL BROWN,

6        Plaintiff,

**COPY**

7

8      VS.         3:06-CV 00710-MHT

9

10  LIBERTY MUTUAL INSURANCE COMPANY,

11  et al.,

12        Defendants.

13

14     DEPOSITION OF BELINDA GAIL BROWN

15

16         STIPULATIONS

17     IT IS STIPULATED AND AGREED, by and

18  between the parties, through their

19  respective counsel, that the deposition of

20  BELINDA GAIL BROWN may be taken before Scott

21  Wilmeth, RPR, Commissioner, State of Alabama

22  at Large, at 2224 1st Avenue North,

23  Birmingham, Alabama, on the 17th day of

## FREEDOM COURT REPORTING

Page 65

1  since the time of your injury, starting with

2  Dr. Watts, Dr. Rogers, two surgeries, Dr.

3  Watts again, Dr. Stewart, and now Dr. Moore,

4  was all of that paid for by Liberty Mutual?

5  A.          Yes, sir.

6  Q.          And then they also approved for

7  you to start going to see Dr. Moore as a

8  pain specialist?

9  A.          Yes, he -- well, Dr. Stewart told

10  me that he got a letter, and he showed it to

11  me, that from now on, Dr. Moore is the only

12  person that could subscribe (sic) anything

13  for me, you know, to be covered under

14  workmans' comp.

15  Q.          So you started seeing Dr. Moore

16  at that point?

17  A.          Right.

18  Q.          And then sometime after that,

19  y'all moved back over to Georgia, where --

20  A.          Well, we just moved a year ago,

21  yeah.

22  Q.          Okay.  So you were having to go

23  to La Grange to see --

## FREEDOM COURT REPORTING

Page 66

1  A.        I was going to La Grange.  It was

2  only like an hour drive, but it was two

3  hours from Georgia, I mean --

4  Q.        And was Liberty Mutual

5  reimbursing you for your mileage?

6  A.        When I turned it in.  I didn't

7  always turn it in.

8  Q.        But when you did, they would pay

9  you for it?

10  A.        Correct.

11  Q.        Now, I want to talk some about

12  Dr. Moore, but before I do that, have we

13  talked about all the doctors that you had

14  been to before Dr. Moore for your back?

15  A.        No, sir, I've seen quite a few of

16  them.

17  Q.        Before Dr. Moore?

18  A.        Right, I mean, in between all

19  this.

20  Q.        Who else would you have seen?

21  A.        Well, I saw some psychiatrists.

22  Q.        Okay.  Was that --

23  A.        Now, this is all during -- well,

## FREEDOM COURT REPORTING

1    A.          Lidoderm, that's it.

2    Q.          They helped some, you said?

3    A.          Uh-huh.

4    Q.          With your legs or your back?

5    A.          My back.  No, if they helped my

6    back, I'd put them all up and down it.

7    Q.          Do you still use those?

8    A.          Yes, sir; I have to.

9    Q.          When Dr. Moore recommended the

10   morphine pump, I think that's when you were

11   sent for a psychological evaluation?

12   A.          Right, correct, uh-huh.

13   Q.          Do you know what the outcome of

14   that was?

15   A.          Let's see.  I don't know.  I

16   never did hear.

17   Q.          But Dr. Moore did not put in the

18   morphine pump?

19   A.          No, we had decided against it,

20   because by that time, my legs had gotten

21   real bad.

22   Q.          Okay.  And he didn't think the

23   morphine pump would help your legs?

## FREEDOM COURT REPORTING

Page 75

```
1    A.        He knew it wouldn't.

2    Q.        And Dr. Moore did say he thought

3    the spinal cord stimulator would help both?

4    A.        Yes, sir.

5    Q.        Both your back and your legs?

6    A.        He didn't say my back.

7    Q.        Your legs?

8    A.        My legs, correct.

9    Q.        You'd still have to take the pain

10   medicine for your back?

11   A.        Uh-huh, because pain medicine did

12   not help my back -- I mean my legs, I'm

13   sorry.

14   Q.        And then I think you went for

15   another psychological evaluation?

16   A.        Dr. Parker or Dr. Orr or

17   something like that.

18   Q.        About the spinal cord stimulator?

19   A.        Right, uh-huh.  And I also got a

20   second opinion on it.

21   Q.        Who was that from?

22   A.        It was a doctor in Columbus,

23   Georgia.  I don't know how to pronounce his
```

## FREEDOM COURT REPORTING

Page 76

1  last name.

2  Q.        Dr. Serrato?

3  A.        If you say so.  It starts with an

4  S, I believe it is.

5  Q.        One that Dr. Moore sent you to?

6  Did you go see that doctor?

7  A.        Workmans' comp had wanted me to

8  go see a neurologist.  Dr. Moore let them

9  know that a neurologist does not put

10 stimulators in.  They don't have anything to

11 do with stimulators.  So they wanted to get

12 a second opinion, and so I ended up going

13 down to Columbus, Georgia.

14 Q.        I think that's Dr. Serrato.

15 A.        Yeah, I only saw one in Columbus.

16 Q.        Okay.  And the net result of all

17 that was, as I understand it, back in June

18 of last year, the spinal cord stimulator was

19 put in?

20 A.        Yes, sir.

21 Q.        Okay.

22 A.        Well, no, wait a minute.  There

23 was a trial put in first.

## FREEDOM COURT REPORTING

Page 92

1    It's my sleeping pill.

2    Q.          What is it?

3    A.          I don't recall.  I can tell you

4    what it looks like.

5    Q.          Lunesta or Ambien or --

6    A.          Ambien, that's it.

7    Q.          Who prescribes it?

8    A.          Dr. Moore.

9    Q.          Do you have trouble sleeping?

10   A.          Yes, sir.  I hurt so bad at

11   night, my husband tells me I wake him up

12   crying.

13   Q.          Does Liberty Mutual pay for the

14   Ambien?

15   A.          Yes, sir.

16   Q.          Okay.  I've got Mobic, Ambien.

17   Which other ones?

18   A.          Well, of course, the two pain

19   medicines.

20   Q.          The Oxycontin and the Lorcet?

21   A.          Yes, sir.  Lidoderm.

22   Q.          Lidoderm patch.  What about the

23   Cymbalta?

## FREEDOM COURT REPORTING

Page 93

1    A.          The what?

2    Q.          The antidepressant?

3    A.          Yes, sir, that's what I was

4    looking for.

5    Q.          So it looks like all of the

6    medicines that are prescribed by Dr. Moore

7    are paid for by Liberty Mutual?

8    A.          Correct.

9    Q.          Do they also pay for your visits

10   to Dr. Moore?

11   A.          Yes, sir, when they pay, yes,

12   sir.

13   Q.          And let me just go back

14   historically and ask you two or three other

15   things.  At some point, I saw a reference to

16   Liberty Mutual paying half on a mattress and

17   box springs.  Do you recall that?

18   A.          Oh, that's right after I hurt my

19   back.  I've already bought another set since

20   then.

21   Q.          Okay.

22   A.          That's because -- yes, sir,

23   that's right, because we had a water bed,

## FREEDOM COURT REPORTING

Page 94

1  and then when I got hurt, I couldn't sleep

2  on it no more.

3  Q.        Is it correct that Liberty Mutual

4  paid half on the mattress and box springs?

5  A.        Yes, sir.

6  Q.        And bought you a treadmill?

7  A.        Yes, sir.

8  Q.        And I think a second one now?

9  A.        Yes, sir.  The first one, the

10 motor blew up, and they said it would cost

11 more to fix it than to get another one.

12 Q.        And I think before they bought

13 the first treadmill, you were driving to

14 your husband's business to work out?

15 A.        Yes, sir.  They had a park where

16 you could go walk, which at the time is all

17 I could do, and I would drive there to

18 Carrollton.

19 Q.        Why did you need to drive to

20 Carrollton to walk, instead of walking in

21 Wedowee?

22 A.        Because they didn't have nowhere

23 level.

## FREEDOM COURT REPORTING

Page 95

1    Q.        Wedowee didn't have nowhere

2    level?

3    A.        No, sir.  Where we live, we'd

4    have to -- I mean, we have to go up hills

5    where I lived.  And not just walking; I was

6    walking on the treadmill at the time.

7    Q.        At Southwire?

8    A.        Right.  And they had a big

9    workout place and it didn't cost nobody no

10    money.

11    Q.        But you were being reimbursed for

12    mileage by Liberty Mutual?

13    A.        Correct.  Well, that's where my

14    doctor had told me to go.

15    Q.        To Southwire?

16    A.        Right.

17    Q.        Okay.  And at some point, I

18    remember seeing that Liberty Mutual paid for

19    a swimsuit for you to do water exercise?

20    A.        I had to do -- I forgot all about

21    that.  That's been years ago.  Yeah, I had

22    the -- for therapy, I had to go and have a

23    swimsuit to go to YMCA, I believe it was.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BELINDA GAIL BROWN, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | Case No. 3:06cv00710-MHT |
| | * | |
| LIBERTY MUTUAL INSURANCE | * | |
| COMPANY, et al, | * | |
| | * | |
| **Defendants.** | * | |

**MEMORANDUM BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Comes now Defendant Liberty Mutual Insurance Company and submits this memorandum brief in support of its Motion for Summary Judgment, filed on even date herewith.

Plaintiff filed this case in the Circuit Court of Randolph County, Alabama, on July 11, 2006, alleging bad faith and outrageous conduct by Defendant for its alleged failure to provide and pay for certain medical treatment for Plaintiff. Defendant removed this case to this court on August 9, 2006.

Plaintiff alleges in her Complaint that she suffered an on-the-job injury on February 2, 1993, that was covered under the Workers' Compensation Laws of the state of Alabama. Defendant is the insurance carrier that has been paying for medical treatment that allegedly arises out of Plaintiff's injury.

Plaintiff further alleges in her Complaint that Defendant has refused to provide and pay for an intrathecal pump and a spinal cord stimulator for the Plaintiff. Plaintiff alleges that such conduct constitutes bad faith and outrageous conduct.

1

Contrary to the allegations of Plaintiff, the affidavit of Vacova Berryhill (submitted in support of and attached to Defendant's Motion for Summary Judgment) reflects that Defendant Liberty Mutual has provided extensive care and treatment for Ms. Brown, including evaluation and treatment by numerous doctors, two back surgeries, epidurals and spinal blocks, steroid shots, physical therapy, one-half of the cost of a mattress and box springs, two treadmills, a swimsuit, a special cushion and back pillow, numerous medications and other treatment for Ms. Brown.  [See affidavit of Vacova Berryhill.]

Ms. Berryhill's affidavit further reflects that at one point in 2002, Dr. Moore did recommend a morphine (intrathecal) pump for Ms. Brown.  Pursuant to recommended protocol and internal guidelines, Liberty Mutual had a psychological evaluation done to see whether Ms. Brown was an appropriate candidate for an implantable device.  The psychological evaluation advised that Ms. Brown was not an appropriate candidate.  Dr. Moore withdrew the request for a morphine pump, saying that it would not help with the numbness in Ms. Brown's legs.  [See affidavit of Vacova Berryhill and pages 74-76 of deposition excerpts of Belinda Brown.]

Ms. Berryhill's affidavit reflects that Dr. Moore next recommended a spinal cord stimulator (SCS) for Ms. Brown.  Pursuant to the Alabama Worker's Compensation Act utilization review procedures, Liberty Mutual initiated a utilization review of Ms. Brown's treatment and the request for SCS.  A first level review was obtained from a nurse case manager and a second level review from a regional medical director, both of whom recommended against the SCS.  Dr. Moore was advised of these recommendations and he disagreed with them.  Rather than follow the appeal procedures set out in the statute for utilization review, Dr. Moore went outside of the utilization review procedures and

obtained a second opinion from a Dr. Serrato in Columbus, Georgia, who said that he felt that Ms. Brown was an appropriate candidate for an SCS.  After considering this matter and seeking the advice of counsel, Liberty Mutual agreed to a test of an SCS on Ms. Brown.  The test was done in the Spring of 2006 and Ms. Brown reported that she got 50 percent relief from her pain.  Approval was given for the implantation of a permanent SCS and this was accomplished in June, 2006.  This lawsuit was filed on July 11, 2006, shortly after the implantation of the permanent SCS.  [See affidavit of Vacova Berryhill.]

Liberty Mutual has continued to pay for pain medicines Oxycontin and Lorcet, Lidoderm patches, sleeping medicine, Ambien, an anti-depressant, and Dr. Moore's office visits.  [See pages 92-95 of deposition excerpts of Belinda Brown.]  Although giving consideration to a possible settlement of Ms. Brown's future medicals and asking her attorney if she would be interested in discussing same, Liberty Mutual has never negotiated such a settlement with Ms. Brown or made an offer to her, and, thus, certainly has never attempted to coerce her into <u>any</u> settlement, much less a low one. [See affidavit of Vacova Berryhill.]

## APPLICABLE LAW

As noted above, Plaintiff alleges claims of bad faith and outrageous conduct (often referred to as the tort of outrage).  In regard to the bad faith claim, the Alabama Supreme Court has held in a number of cases that bad faith claims are barred by the exclusivity of remedy provisions in the Alabama Workers' Compensation Act.  *See, e.g., Hobbs v. Alabama Power Co.,* 775 So. 2d 783 (Ala. 2000) (Alabama Supreme Court

recognized that Alabama Code Section 25-5-59(b) provides the only remedy for an employee when payments are delayed.)

The Alabama Supreme Court has allowed tort of outrage cases to proceed in the workers' compensation setting, but only in very limited, fact-specific situations.  In order to establish a claim for outrage, a plaintiff must prove: "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *American Road Service Co. v. Inmon*, 624 So. 2d 361, 365 (Ala. 1980).  A plaintiff must demonstrate that the defendant engaged in conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.*  This test is to be applied very strictly.  *See, e.g., Ex parte Crawford & Co.,* 693 So. 2d 458 (Ala. 1997).  Alabama courts have made it clear that "the tort of outrage was not developed to provide a personal remedy for the trivial emotional distresses that are common to each person in his everyday life.  Such [distresses are] the price of living among people." *U. S. A. Oil, Inc. v. Smith*, 415 So. 2d 1098, 1101 (Ala. Civ. App. 1982).

The Alabama Supreme Court has only upheld findings of outrageous conduct in two workers' compensation medical benefits cases over the years, and these were very extreme and fact-specific situations.  These cases are *Continental Casualty Insurance Company v. McDonald,* 567 So. 2d 1208 (Ala. 1990) and *Travelers Indemnity Company of Illinois v. Griner*, 809 So. 2d 808 (Ala. 2001).  In both of these cases, the evidence established that the insurance carrier had withheld pain medicine and treatment <u>for over five years.</u>  This withholding of treatment was done with a knowledge that the plaintiff

4

was suffering from severe pain and it was also done to try to force the plaintiffs to try to settle their future medical benefits for an extremely low amount of money, much less than the projected future cost of the benefits.  In *McDonald*, the Alabama Supreme Court recited numerous delays and denials of treatment extending over several years, almost all without any justification or attempt by the insurance carrier to properly respond to or resolve the issues.  The Court further pointed out that the insurance carrier documented that it expected the claimant's medical bills to total from $71,000 to $115,000, yet only offered the claimant $1,000 per year (at a cost of $9,096 for an annuity) to settle.

In *Griner*, the Alabama Supreme Court also outlined delays and denials of treatment lasting for years and then pointed out that the insurance carrier documented that it could reasonably expect to pay $279,400 for the claimant's benefits over his lifetime.  In contrast, the carrier offered *Griner* $5,000 to settle his future medicals.  In response to a counter-demand from the claimant, the insurance adjuster wrote in *Griner's* file "I simply chuckled and stated we are not interested in anything near that." 809 So. 2d at 812.

The facts of this case are distinguishable from *McDonald* and *Griner* and are, instead, similar to the much more recent case of *Soti v. Lowe's Home Centers, Inc.,* 906 So. 2d 916 (Ala. 2005).  In *Soti*, the defendant provided extensive and continuing medical treatment for the plaintiff for three years, including three back surgeries.  See *Id.* at 920.  Stating that the facts "differ[ed] dramatically" from those of McDonald, the *Soti* court held that the Plaintiff had not presented sufficient evidence to support his

5

claim of outrage.  Likewise, Liberty Mutual in this case has provided for extensive treatment for Plaintiff for more than ten years, and continues to provide treatment.

Outside of *McDonald* and *Griner*, numerous cases from the Alabama Supreme Court have held that the evidence did not support a tort of outrage claim in the context of denying medical benefits under the workers' compensation act.  For example, in *Farley v. CNA Insurance Company*, 576 So. 2d 158 (Ala. 1991), an insurance carrier failed to timely pay medical bills, sent claimant to various doctors, withheld authorization for medical treatment, displayed an unsympathetic attitude to claimant, and gave the claimant the runaround.  576 So. 2d at 160.  The Alabama Supreme Court held that this conduct failed to meet the threshold requirements for outrageous conduct.  *Id.*  In a similar case, *Ex parte Crawford and Company*, 693 So. 2d 458 (Ala. 1997), the plaintiff claimed that the workers' compensation carrier deliberately delayed paying his medical bills in an attempt to force him to settle his claims for future medical benefits.  693 So. 2d at 459.  In support of his claim, the plaintiff claimed that the conduct of the workers' compensation carrier caused him embarrassment and frustration.  *Id.* at 461.  The Alabama Supreme Court held that the deliberate conduct of delaying payment of medical bills indicated that the workers' compensation carrier intended to cause the plaintiff emotional distress.  However, the Supreme Court additionally held that this conduct was "far from being beyond all possible bounds of decency and utterly intolerable in a civilized society."  *Id.*  In accordance with its holdings, the Supreme Court noted that "[a]lthough constant delay may be inconvenient and upsetting at times, the workers' compensation insurance carrier's alleged conduct still does not meet the stringent test of outrageous conduct. . ."  *Id.*

**CONCLUSION**

Plaintiff's bad faith claim is barred by the exclusivity provisions of the Alabama Workers' Compensation Act.  In regard to Plaintiff's outrage claim, it is clear from the evidence that Defendant's alleged conduct does not rise anywhere near the level established as a minimal floor by the Alabama Supreme Court in the *McDonald* and *Griner* cases.  Thus, Defendant is entitled to summary judgment as to both Plaintiff's bad faith and outrage claims and this case against Defendant is due to be dismissed.

Respectfully submitted,

s/Richard B. Garrett
Richard B. Garrett (ASB-0782-A29R)

RUSHTON, STAKELY, JOHNSTON
& GARRETT, P.A.
Post Office box 270
Montgomery, Alabama 36101-0270
Telephone:  334/206-3100
Fax:  334/263-4157
E-mail:  rbg@rsjg.com

**Attorney for Defendant**

I hereby certify that on May 4, 2007, I electronically filed the foregoing with the Clerk of the court using CM/ECF system which will send notification of such filing to the following:  **STEPHEN D. HENINGER.**

**s/Richard B. Garrett**
OF COUNSEL

7