IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BELINDA GAIL BROWN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION: 3:06cv00710-MHT |
| | ) | |
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF'S BRIEF AND EVIDENTIARY SUBMISSION IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a case alleging outrageous conduct for the withholding of medical treatment from a worker's compensation claimant. The original work related injury occurred in 1993. Plaintiff had lengthy and obstructive difficulty in getting authorized treatment approved and provided as will be set forth in detail herein. This suit was filed on July 11, 2006, in the Circuit Court of Randolph County. The case was removed to this Court based upon diversity jurisdiction on August 9, 2006.

**FACTUAL DISCUSSIONS**

Plaintiff has requested and recently received the claim file for the injury at issue. This file reflects a short hand summary of the Plaintiff's injury created on February 22, 2006:

"Pt is a 49 YO manufacturing worker who injured her back with heavy lifting in 1993. She has undergone 2 spine surgeries but still has chronic pain despite multiple narcotic pain meds including Oxycontin 120 mg/day and Lorcet 40 mg/day."

(See attached Exhibit "1").

Liberty Mutual approved the authorization of Dr. Efrin Moore (Pain Medicine Specialist) in May, 2001. (See attached Exhibit "2"). Dr. Moore advised Liberty Mutual that the Plaintiff was suffering

from "failed back syndrome" and "SI joint dysfunction" and kept them regularly apprised of her treatment.

In 2002, the authorized physician felt that the Plaintiff needed to be put on a pump or another means of treating her severe and chronic pain.  (See attached Exhibit "3").  She had been receiving steroid injections for several years and developed Cushings Syndrome and bruising because of this approach.  (See attached Exhibit "4").  She was also not responding well to some of the oral medications.  (See attached Exhibit "3").  The insurer sent the Plaintiff to Dr. Rex Harris for an Independent Medical Exam.  Dr. Harris reported back that the Plaintiff was indeed suffering from "failed back surgery and SI joint arthropathy."  (See attached Exhibit "5").  Dr. Harris confirmed: "I can relate her current condition to her injury of 1993.  Her present medical status is that she is in chronic pain...It is my medical opinion that her current symptoms are related to the original injury and that her current treatment is appropriate."  (See attached Exhibit "5").  He concluded that if any further information was desired, Liberty Mutual should not hesitate to contact him.  No further questions were sought to be addressed.  Dr. Moore, the authorized physician wrote to try to determine why his patient was being given such a difficult time.  (See attached Exhibit "6").  Dr. Moore continued to press for a spinal cord stimulator and explained in detail why the Plaintiff needed this approach.  (See attached Exhibit "7").  Dr. Moore continued to point out to the insurer that the spinal cord stimulator was reasonable and necessary and that their selective reviewers were not qualified to address this medical issue.  (See attached Exhibit "8").  The authorized physician informed Liberty Mutual that this patient was an "ideal candidate" for this spinal cord stimulator and that the process of denying this therapy was causing her condition to worsen.  (See attached Exhibit "9").  Another physician, Dr. Serrato, expressed his independent agreement with this requested

approach. (See attached Exhibit "10"). Dr. Serrato was a pain specialist just like the authorized physician, Dr. Moore.

The insurer sent the Plaintiff to a psychologist to review whether he felt she needed the pump requested in 2002. He felt the patient may be malingering. (NOTE: Liberty Mutual's IME by Dr. Harris refutes this aspect in its entirety). The authorized physician wrote Liberty Mutual to contest these findings with great energy. (See attached Exhibit "3"). The insurer then sent the Plaintiff to a medical doctor (not a psychologist) for her opinion. Dr. Pamela Parker seriously questioned the statements made by the prior psychologist. (See attached Exhibit "11"). Moreover, she agreed the pump was a possible route, but that perhaps the patient should receive non-narcotic medicines first. She did not say the approach of the authorized physician was not reasonable and necessary. Finally, Liberty Mutual sent the Plaintiff to Dr. Scott Richards at UAB in February 2006, who concluded "see no contraindication currently for proceeding with a stimulator trial." (See attached exhibit "12"). This was four years from when the authorized physician started this process for a patient in severe, constant pain. No pain specialist had been consulted who ever said that what the authorized pain specialist was requesting was not reasonable and necessary. Instead, Liberty Mutual sought a review of the file by a rehabilitation doctor. (See attached Exhibit "13"). The authorized physician pointed out why this review was faulty. (See attached Exhibit "8"). The Plaintiff finally had the spinal cord stimulator implanted on June 30, 2006. (See attached Exhibit "14").

As early as July 2002, the insurer was making notes in the file about negotiating "a nominal settlement" in the future medicals. (See attached Exhibit "15"). In fact, they tried to settle for $15,481.35 in April and August of 2000. (See attached Exhibit "31"). There were notes that this claimant "meets the guidelines for malingering and likely has tried to manipulate the tests." (See

attached Exhibit "16"). In January 2003, the insurer noted that with her life expectancy, the insurer was facing a $360,000 medical reserve. (See attached exhibit "17"). The insurer also opined at that time in 2003 that the case should be settled "based on the likelihood that claimant will eventually get a pump." (See attached Exhibit "18"). A journal entry on October 22, 2003, states:

> "In summary, it appears there are three physicians recommending the pump -
> Dr. Moore, the attending; Dr. Parker, psychiatrist, who only recommended the pump
> should not be the 1st choice above pharmacology attempts; and Dr. Harris, orthopedic
> surgeon who did not specifically address the pump but felt her present condition was
> completely related to the original W.C. injury on 2/2/93 and that her treatment plan
> had been appropriate." (See attached Exhibit "19").

On February 24, 2004, the Home Office suggested that it was unclear at this point if a pump would be utilized but, if so, the medical reserves should be $852,071.00. (See attached Exhibit "20").

> On March 29, 2005, a journal entry in this file stated:

> "Potential medical savings based on SCS (Spinal Cord Stimulator) denial
> totals approximately $275,000.00." (See attached Exhibit "21"). (NOTE: the entry
> goes on to state that even without the stimulator, 'the claimant will require "$586,554
> for pharmacy only over her life span.' The entry says the Plaintiff's attorney has been
> contacted to discuss possible medical settlement)."

That same month, an entry was made: "Let's continue our efforts to contact the attorney to determine if settlement is a possibility. If not, we need to address the necessity for DCS" (stimulator). (See attached Exhibit "22"). They already had the obligation to address this necessity. Why wait until settlement explored - to save money? Liberty Mutual was well aware of their obligation and the tort

-4-

of outrage.  (See attached Exhibit 23).  The claimant's attorney was pushing for treatment of his

client rather than settlement.  See attached Exhibit "24").

      After four years of struggling by the authorized physician to get this patient what she needed,

the adjuster wrote in the file on March 21, 2006:

> "This is an AL medical only file.  Dr. has recommended a SCS.  Under AL
>
> law, I had to authorize the SCS even though the value is questionable."  (See attached
>
> Exhibit "25").

The authorized physician had as his goal, the treatment of the patient <u>and</u> to reduce the patient's

medication.  (See attached Exhibit "26").  Liberty Mutual did not feel that their pharmacy obligation

would be reduced.  (See attached Exhibit "26").  On April 6, 2006, a journal entry at the insurer's

office stated:

> "Paid Med. is $234,708.  MCS shows $21,256 spent in 2005, roughly $3,500 higher
>
> than 2004.  Rx has been the escalating cost-driver for the past 3 years: 60% of 2003
>
> med costs, 75% of 2004's and almost 89% of 2005 med bills.  If DCS trial succeeds,
>
> and clt. gets a permanent stimulator implant, then we must periodically scrutinize
>
> incoming medical reports and bills, to determine whether Dr. Moore's stated
>
> objective of reduced oral Rx is being met."  (See attached Exhibit "27").

In July 2006 (after finally getting the implantation) a journal entry stated:

> "At this time we are not in a position to settle.  Clt. having permanent SCS
>
> implanted on 6/30.  Once recovery is done will try to settle again."  (See attached
>
> Exhibit "28").

The attempt to settle while holding up on the stimulator had failed.  This dispute was leverage for

the insurer. (See attached Exhibit "29"). The insurer ignored the pleas of its authorized pain specialist and wrote that it would not authorize it. (See attached Exhibit "30"). Money was the issue. Even as late as February 2006, when their IME at UAB was recommending the stimulator, we see this discussion in the file:

> "A psychological evaluation was completed 2/14/06 by Dr. Scott Richards. He opined there were no contraindications for proceeding with a stimulator trial."

* * * *

> "This 48 yr old female has a remaining life expectancy of 33.9 years. Medical expenses have increased over the past 2 years totaling an average of $19,707/yr. The primary cost driver is pharmacy. Also, the claimant is currently undergoing review for implantation of a SCS that appears will be approved. Subsequently the recommended medical reserve that would include SCS implantation and maintenance is $828,500. The current medical reserve of $545,573 is too low." (See attached Exhibit "1" at p. 2).

## LEGAL AUTHORITY

The law of Alabama requires that the Workmen's Compensation Act be liberally construed to effect its beneficent purpose for the injured employee. *Calle v. Brook & Blevins, Inc.*, 723 So.2d 65 (Ala. Civ. App. 1998). All reasonable doubts are to be resolved in favor of the employee. *Cooper v. Nicolleta*, 797 So.2d 1072 (Ala. 2001). Withholding reasonable and necessary medical treatment may be addressed through the tort of outrage where it is undertaken either intentionally or recklessly with a vulnerable claimant. *Continental Casualty Co. v. McDonald*, 567 So.2d 1208 (Ala. 1990); *Travelers Indemnity Co. v. Griner*, 809 So.2d 808 (Ala. 2001).

An employer/worker's compensation insurance carrier cannot dictate the course of treatment for an injured employee after the employee is under the care of an authorized physician. *City of Auburn v. Brown*, 638 So.2d 1339, 1340 (Ala. Civ. App. 1993). In the *Brown* case, the Court specifically stated:

> "We hold that, as a general rule, the employer may not dictate to the employee that he may not have the medical treatment recommended by his authorized, treating physicians." 638 So.2d at 1340.

In *Waffle House, Inc. v. Howard*, 794 So.2d 1123 (Ala. Civ. App. 2000), the Court held that the employer cannot withdraw its authorization of a physician for treatment. The Court stated:

> "Further, when an employer authorizes treatment for an employee by one physician and the employee is satisfied with the treatment provided by that physician, the employer loses its authority to withdraw its authorization for treatment by that physician." 794 So.2d at 1130.

If a Utilization Review Process is undertaken, it must follow the Act. There are three (3) tiers to be exhausted: (1) qualified nurse to look at reasonable medical necessity; (2) a physician; and (3) if the authorized physician disagrees, there <u>must</u> be a review by a physician who of the same specialty as the treating physician. *Ex parte Southeast Alabama Medical Center*, 835 So.2d 1042 (Ala. Civ. App. 2002).

The tort of outrage requires proof of severe emotional distress. The Alabama Supreme Court recognized in *Ex parte Crawford & Co.*, 693 So.2d 458, 461 (Ala. 1997) that in the worker's compensation setting, the first elements for outrage are met where there is evidence of:

> (1)     The insurer being aware that the claimant was becoming frustrated

with medical payment delays.

      (2)    Internal documents showing the insurer wanted to persuade the claimant to settle his future medical benefits.

      (3)    Internal documents that show the insurer expected the claimant's medical bills would continue indefinitely.

The Court noted in *Crawford* that that particular Plaintiff had not met the requirement of severe emotional distress because he simply testified he was "embarrassed."

## ARGUMENT

This case reflects obvious attempts to deny the reasonable and necessary treatment recommended by the Plaintiff's authorized pain specialist. The exhibits clearly establish that this Plaintiff was in severe and constant pain. The stimulator was necessary to reduce her intake of oral narcotics and to eliminate the problems she was having with the use of steroid blocks which had induced Cushings Syndrome and a propensity for bruising. Liberty Mutual was focused on the financial impact of this stimulator rather than what was reasonable and necessary for this Plaintiff's treatment and the alleviation of her severe and chronic pain. Despite the requirements of Utilization Review, Liberty Mutual never had a pain specialist to review the recommendation of the authorized pain specialist. (Dr. Moore did have another independent pain specialist, Dr. Serrato, review his recommendations and Dr. Serrato agreed with the use of the stimulator. (See attached Exhibit "10"). The law is clear to the effect that Liberty Mutual cannot dictate that the claimant cannot have treatment recommended by the authorized treating physician. *Brown v. City of Auburn*, 638 So.2d 1339, 1340 (Ala. Civ. App. 1993). Moreover, if the insurer questions the reasonableness or medical necessity of the recommended treatment, it must have a review performed by a specialist who is of

the same specialty as the authorized treating physician. *Ex parte Southeast Alabama Medical Center*, 835 So.2d 1042, 1050-1051 (Ala. Civ. App. 2002). §25-5-293(k) Code of Alabama 1975 "places a condition on the employer and its right to refuse to agree to pay for a medical treatment on the ground that it is not reasonably necessary." 835 So.2 at 1050. The appeals court emphasized the standard of reasonable necessity is not "absolute or strict necessity" and does not limit the patient to the "best" necessity. "Nothing in the Act suggests that there can be only one "reasonably necessary' approach to treating a given patient and his or her injury or illness. Instead, the recommended treatment must fall within the parameters of what is reasonably necessary for a patient with the condition suffered by the employee." (835 So.2d at 1044 F.N. 2). The third level of review requires a specialist who is similarly situated to the authorized physician. 835 So.2d at 1051.

Liberty Mutual sent the Plaintiff to a psychologist rather than a medical doctor. This psychologist said that the Plaintiff was malingering. Liberty Mutual had evidence from an IME it arranged with Dr. Rex Harris (orthopedic surgeon) that confirmed her chronic pain and related it to the original injury in 1993. (See Attached Exhibit "5"). Moreover, the insurer then sent the Plaintiff to Dr. Pamela Parker (a medical doctor) who seriously questioned the prior psychologist's suggestion of malingering. (See attached Exhibit "11"). It was only when a psychologist at UAB, Dr. Scott Richards, again concluded that the stimulator was reasonable and necessary that Liberty Mutual finally relented. No pain specialist ever expressed the opinion that the stimulator was not reasonable and necessary. Dr. Moore, the authorized physician, was vehement in his constant urging of this treatment and was always critical of Liberty Mutual's refusal to authorize it to alleviate this severe and chronic pain.

The internal documents from Liberty Mutual clearly identify the reason for withholding this

-9-

treatment for four years. Money. The insurer was facing a large sum for future medical treatment for this patient. In 2002, the adjuster's notes reflect a plan to negotiate a "nominal settlement" of future medicals. The insurer knew at that time that its predicted future medicals were $360,000 without a pump and there was a likelihood she would eventually get it. (See attached Exhibits "17" and "18"). When Dr. Moore decided the stimulator would be better than the pump they had denied, the insurer put in the file that "potential medical savings based on SCS (Spinal Cord Stimulator) denial totals approximately $275,000.00." (See attached Exhibit "21") (emphasis added). This was over two years before the insurer finally relented when Dr. Scott Richards made his report. Meanwhile, Liberty Mutual was planning a "nominal settlement" of these enormous predicted expenses. Expenses that were reasonable and necessary to alleviate severe and constant pain. Expenses that were predicted to be over $850,000.00 over the expected lifetime of the Plaintiff. (See attached Exhibit "20"). Rather than seeking to help this claimant and meet its obligations under the Act, this insurer was trying to label the Plaintiff a "malingerer" or a fake who tried to manipulate her tests. (See attached Exhibit "16"). There is absolutely no evidence that Liberty Mutual was trying to help this Plaintiff or was concerned about her well being. This continues to this day as the insurer refuses to authorize a surgery that her physician says is necessary. It is simply an attempt to save money and frustrate this claimant. The Court has clearly recognized this as the blueprint for outrageous conduct in the worker's compensation context. (See, *Ex parte Crawford & Co.*, 693 So.2d 458, 461 (Ala. 1997).

The monitoring and evaluation of future medical costs is a common actuarial undertaking for insurance companies. They are engaged in a business that agrees to cover risks for a premium. It is not acceptable that this process be infected with a calculus that weighs the pain and frustration

of the claimant against the cost to the company for performing its obligations. The claimant cannot be held hostage in an effort to reduce costs by denying what her own authorized physician recommends while the insurer candidly admits in its internal files that it is hoping to induce the claimant to settle her future medical requirements for a "nominal settlement." For this Court to conclude as a matter of law that such conduct is acceptable would turn the beneficent purposes of the Worker's Compensation Act on its head and expose injured workers to a capricious process focused only on costs and not the reasonable and necessary medical consideration that was intended to be the focus.

The Defendant argues in its brief that there were no actual offers made to the claimant to settle so there can be no finding of outrageous conduct. This is shown to be false by the attached Exhibit "31" from attorney Oliver Kitchens' file. This was not produced by the Defendant for some reason. The issue is the intentional or reckless disregard of the Plaintiff's medical needs and its motivation. This inquiring was given flesh in *Continental Casualty Insurance Company v. McDonald*, 567 So.2d 1208 (Ala. 1990) and *Travelers Indemnity Co. of Illinois v. Griner*, 809 So.2d 808 (Ala. 2001). Both of those cases involved "failed back" syndrome just like this case. These cases became expensive for insurers because of the severe and chronic pain. These cases involved withholding treatment recommended by the authorized physician for five years. This one went for over four years. The internal files reflect the same motivation for withholding this treatment as was established in *McDonald* and *Griner* - to save money. This insurer knew of the Plaintiff's severe and constant pain. This insurer knew of her fragile depressed state. The expected lifetime payout for the medicals in this case was four times higher than in *Griner* and eight times higher than *McDonald*. This insurer put in writing that it planned on negotiating "a nominal settlement" of the

-11-

future medicals and the denial of this stimulator was the leverage to cause frustration and pain. This is the precise conduct of using a powerful position to cause pain to a vulnerable claimant which the tort of outrage was meant to remedy and prevent. It is of no small coincidence that Liberty Mutual expressed concerns in this file about getting sued for the tort of outrage. (See attached Exhibit "24").

The authorized physician told Liberty Mutual that its refusal to allow this stimulator was causing her condition to worsen. (See attached Exhibit "9"). He even had his patient examined by a different pain specialist to see if his treatment plan was correct. Dr. Serrato said the stimulator was reasonable and necessary. (See attached Exhibit "10"). The IME requested by Liberty Mutual said Dr. Moore's treatment was appropriate. (See attached Exhibit "5"). Dr. Rex Harris invited further questions from Liberty Mutual, but they declined to ask for anything further. They just folded their arms and refused to relent while this patient suffered for four years.

The Plaintiff has prevented evidence which shows that this Defendant is not entitled to Judgment as a Matter of Law. There are clearly sufficient facts to warrant a jury decision on the conduct and whether it meets the tort for outrage. We urge denial of the Motion for Summary Judgment.

s/Stephen D. Heninger
Stephen D. Heninger
Attorney for: Plaintiff
Heninger Garrison Davis, LLC
P. O. Box 11310
Birmingham, Alabama 35202
Telephone:     205.326.3336
Facsimile:     205.326.3332
E-mail:          Steve@hgdlawfirm.com
[ASB5227E68S]

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard B. Garrett, Esq.
RUSHTON, STAKELY, JOHNSTON
 & GARRETT, P.A.
P. O. Box 270
Montgomery, Alabama 36101-0270
Telephone:    334.206.3100
Facsimile:    334.263.4157
E-Mail:        rbg@rsjg.com


                                        s/Stephen D. Heninger
                                        Stephen D. Heninger [ASB5227E68S]

-13-